No. 14347

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

IN THE MATTER OF THE ESTATE OF
MAURICE D. MURPHY, Deceased.

---

Appeal from:   District Court of the Fifteenth Judicial District,
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

Traynor and Hoversland, Scobey, Montana
Kenneth W. Hoversland argued, Scobey, Montana
Robert L. Stephens, Jr., Billings, Montana
David B. Kinnard argued, Billings, Montana

For Respondents:

James Gardner argued, Dept. Labor, Helena, Montana
James McCann argued, Wolf Point, Montana
Earl C. Gross, Hardin, Montana
James A. Torske, Hardin, Montana
Kronmiller and Seykora, Hardin, Montana
John M. Dietrich, Billings, Montana
Douglas Freeman, Hardin, Montana
Loren J. O'Toole, Plentywood, Montana

---

Submitted:   February 5, 1979

Decided:   AUG - 9 1979

Filed:   AUG - 9 1979

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

This is an appeal from a probate proceeding in the District Court, Daniels County. A number of Maurice D. Murphy's creditors have appealed from a June 1, 1978 order, which authorized the personal representative of Maurice Murphy's estate to take all cash and personal property in the personal representative's possession and deliver the same to respondent, Northeast Montana Production Credit Association of Wolf Point (hereafter PCA).

Technically, this appeal only involves an order entered June 1, 1978; however, to understand why we must remand without a decision on the merits, it is necessary to briefly review the convoluted history of Maurice D. Murphy's estate.

Maurice D. Murphy died testate on December 7, 1973. At the time of his death, Murphy was heavily in debt; his principal creditors were: (1) W. J D. Graham, et al.-- $464,392.28--this balance was due under a contract for deed executed by the decedent prior to his death; (2) PCA-- $305,687.24--this was a secured debt incurred by decedent to finance his ranching operations; and (3) Citizen's State Bank of Scobey, Montana (hereafter Bank)--$72,667.75--this is an unsecured debt owed by decedent on a personal note to the Bank. Decedent also owed approximately $100,000 to other unsecured creditors.

On December 20, 1973, Ralph Shiell was appointed personal representative of Maurice D. Murphy's estate. Shiell's first act was to apply for authorization to continue the decedents ranching business; at the same time, Shiell applied for authority to borrow $91,077 from PCA for the estate and to be allowed to secure such a loan by executing mortgages on the estate's livestock, equipment

-2-

and feed. The District Court routinely granted all of Shiell's requests and specifically found that such action "is in the best interests of the estate."

On February 26, 1974, after all of the money from the first loan had been expended, Ralph Shiell petitioned the District Court for authorization to borrow an additional $138,500 from PCA to enable Shiell to continue operating the Murphy ranch and to allow him to pay off certain creditors of the estate. This request was also routinely granted. Thus, during the first three months after his death, Maurice Murphy's estate became indebted to PCA for an additional $229,577 with all loans _purportedly_ secured by mortgages on the estate's livestock, machinery and feed.

On March 29, 1974, Ralph Shiell filed his notice of resignation with the District Court and requested that his accounts be approved and his responsibility to the estate terminated. A hearing on this matter was set for August 9, 1974, and at that time Shiell's resignation was accepted, his accounts approved, and Gary Murphy, decedents son, was appointed to succeed Shiell as administrator.

Gary Murphy administered the estate from August 9, 1974 until September 20, 1976, the date he filed his resignation with the District Court. During his term as administrator, Murphy was authorized by the District Court to borrow the following sums from PCA:

| AMOUNT | DATE | SECURITY GIVEN |
|---|---|---|
| $ 75,630 | September 26, 1974 | Mortgage on livestock, machinery and feed |
| $103,737 | March 13, 1975 | Mortgages on livestock, machinery, feed _and_ real estate |
| $ 29,400 | August 22, 1975 | Mortgage on livestock, machinery and feed |

-3-

| $ 18,000 | October 30, 1975 | Mortgage on livestock, machinery and feed |
| $ 85,000 | December 10, 1975 | Mortgage on livestock, machinery and feed |
| $ 25,000 | March 10, 1976 | Mortgage on livestock, machinery and feed |
| $336,767 | TOTAL | |

On March 29, 1976, Loren O'Toole, one of the attorneys for the estate, petitioned the District Court for authority to sell 1,017 head of estate cattle (all of the cattle were pledged as security for the various PCA loans). The authorization to sell was granted by the District Court and O'Toole was able to sell the cattle to John Wycoff, James Wycoff, and Richard Redland for a consideration of $263,120.

Thereafter, O'Toole filed a second petition (August 9, 1976). This petition asked the District Court to determine which creditors should receive payment from the funds held for the estate. O'Toole's petition stated that the estate currently had $286,545 on hand, and that "with the exception of $22,500.00 all of the sums above came from the sale of cattle, which were mortgaged to the Production Credit Association of Wolf Point, Montana."

The District Court set O'Toole's petition for hearing on September 3, 1976; however, because of various delays, the court did not hold the hearing until September 20, 1976. At that time, the court held an informal, unrecorded conference in the judge's chambers. Apparently, the parties attending the informal conference agreed to submit written briefs detailing their theories on how the $286,545 should be distributed.

On November 22, 1976, after receiving a number of written briefs and after entertaining further arguments

-4-

(also not recorded) the District Court entered the following order:

> "Payments from the estate of the above named decedent are ORDERED as follows and in this order of priority:
>
> "1. The contract for deed entered into on the 10th day of July, 1973 by and between W. J. D. Graham and Ruth M. Graham, husband and wife; William S. Graham and Lavere C. Graham, husband and wife, as sellers, and Lalon Fladager and Daryl Fladager, and the assignment made thereunder;
>
> "2. Secured and unsecured obligations owing to the Production Credit Association, Wolf Point, Montana that existed as of the date of death and any advances made upon petition and approved by specific court order after the date of death;
>
> "3. Statutory Attorneys fees, and fees of the Personal Representatives, and Accountants' fees as determined by the Court; (Public policy compells that attorneys fees must receive a priority in estates of questionable solvency or insolvent estates would not be properly administered with the advice of counsel. If there are insufficient funds for full payment of Paragraphs 1, 2 and 3, then the payment as provided in Paragraphs 2 and 3 will be pro-rata).
>
> "4. Extraordinary fees of the attorneys, accountants, and the personal representatives as determined by the Court;
>
> "5. Creditors as of the date of death;
>
> "6. Any claim of the second personal representative, Gary Murphy, for monies expended, and determined to be necessary and reasonable, for the preservation of the estate assets;
>
> "7. Beneficiaries under the terms of the Will or otherwise; and
>
> "8. Any other funds advanced by the Production Credit Association after this date, for purposes necessary for the preservation of the estate assets, and approved by an Order of Court, will be paid in accordance with Paragraph 2 of this Order, and subject only to the Graham contract referred to in Paragraph 1 and, if necessary, pro-rated as provided in Paragraph 3."

Gary Murphy, a party designated to receive payment in no. 6 of the November 22, 1976 order, filed a petition for writ of supervisory control with this Court. This Court heard oral arguments on October 6, 1977, and later declined jurisdiction for the following reasons:

-5-

"(1)  This is a fragmented appeal without
the necessary record to support a review.

"(2)  This matter comes to this Court on
brief only.  There is no evidence of a proper
hearing in the District Court due to the
absence of a transcript record.

"(3)  If a hearing was had, we cannot be
sure that all interested parties were
represented.

"(4)  We find no evidence in the court record
of a determination of validity of the claims
involved.

"For these reasons the application of Petitioner
Relator is dismissed without prejudice."  Murphy
v. District Court (1977), _____ Mont. _____, 571
P.2d 803, 804, 34 St.Rep. 1365, 1366.

From the time this Court issued its November 17, 1977

decision until February 1, 1978, the District Court file

reflects little activity on the part of the Murphy estate

administrators.  The most activity we can discern occurred

on February 1, 1978, when PCA filed a petition seeking an

order directing the personal representative to pay over the

estate assets in partial satisfaction of the PCA claim.  A

hearing on the PCA petition was held on March 1, 1978, in

Wolf Point, Montana.  A transcript of that proceeding was

kept, and it indicates that the PCA, the Bank, Gary Murphy

and the attorneys for the estate were present, and presented

oral argument to the court.  It also indicates that Douglas

Freeman, attorney for the administrator, Erle C. Gross, had

notice of the hearing, but was unable to attend due to bad

weather.

After hearing oral arguments, the District Court entered

the following one page order on June 1, 1978:

"Northeast Montana Production Credit Association
having on the 31st day of January, 1978, filed
its petition herein directing payment to it
of $499,686.37 together with interest; and
following hearing on said petition on March 1,
1978;

-6-

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the personal representative is authorized and directed to take all cash and personal property now in his hands as belonging to decedent's estate and to deliver the same to Northeast Montana Production Credit Association to payment of its claim. Items of personal property may be sold and converted to cash prior to such delivery at the discretion of personal representative."

Citizens State Bank of Scobey, a creditor with an ante mortem debt, filed a notice of appeal from the June 1 order on June 8, 1978. The Bank claims it has first priority over all other estate claims, and therefore the District Court erred in awarding PCA first priority.

The notices of appeal filed by Gary Murphy and the State Department of Labor do not appear in the record transmitted to this Court; however, the District Court Clerk has informed this Court that timely notices were filed on behalf of the Department and Murphy. Accordingly, we shall assume that Murphy and the Department have complied with Rule 4, Mont.R.App.Civ.P.

The Department and Murphy claim to be entitled to a pro rata share of the funds and personal property in the personal representative's possession. They allege their claims are costs of administration and are in the same class as PCA's claim.

The June 1, 1978 order is an appealable order under Rule 1, Mont.R.App.Civ.P. That rule specifically provides that "an order directing the delivery, transfer, or surrender of property" may be appealed by an aggrieved party. Thus, the parties are properly before this Court.

Unfortunately, this Court is still not in a position to finally dispose of the matter on the merits. The order entered by the District Court states simply "that the personal representative is authorized and directed to take

-7-

all cash and personal property now in/hands . . . and
his
to deliver the same to Northeast Montana Production Credit

Association to (sic) payment to its claim." There is no

memorandum opinion or other explanation of the basis for

entry of the order. The parties and this Court are left

to speculate as to why the District Court found PCA entitled

to the proceeds in the possession of the personal representative.

Briefs and oral arguments before this Court clearly assert

that the parties are not certain which law the District Court

judge applied (the old probate provisions or the provisions

of the Uniform Probate Code), which claims are valid, and

which classification was given to the various claims. As

a result, this Court is not in a position to enter a binding

decision on the merits.

Although Rule 52, Mont.R.Civ.P. is seldom used in

probate proceedings, we feel that it must be applied to

the present fact situation so that this Court will know

precisely the questions presented for appellate review.

We recently defined the underlying reasons for findings of

fact and conclusions of law:

> "The purpose of requiring findings of fact
> is three-fold: 1) as an aid in the trial
> judge's process of adjudication; 2) for
> purposes of res judicata and estoppel by
> judgment; and 3) as an aid to the appellate
> court on review. 5A Moore's Federal Practice
> ¶52.06[1]." Marriage of Barron (1978), _____
> Mont. _____, 580 P.2d 936, 938, 35 St.Rep.
> 891, 894.

For purposes of this opinion, reason no. 3 is most

important. As the record now stands, we can only speculate

on the factors which went into the District Court's decision.

The facts of this case require a remand to the District Court

so that a proper order can be entered. The District Court

is directed to enter findings and conclusions or a memorandum

clarifying the order it entered June 1, 1978.

-8-

This cause is remanded for action consistent with this opinion.

_____
                Justice

We Concur:

_____
Chief Justice


_____


_____
            Justices